IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 30, 2003

## STATE OF TENNESSEE v. KATHYRN WHITE BYRD

**Direct Appeal from the Criminal Court for Washington County**
**No. 23186     Robert E. Cupp, Judge**

---

**No. E2002-00417-CCA-R3-CD**
**May 29, 2003**

---

The Defendant, Kathryn L. Byrd, was convicted by a jury of one count of theft over $1,000. The trial court subsequently sentenced the Defendant to four years in the Department of Correction, to be served consecutively to a previous sentence. The Defendant now appeals, contesting the sufficiency of the evidence; claiming reversible error because the State was not required to elect the offense for which it was seeking a conviction; and contesting the trial judge's order of consecutive sentencing. We affirm the Defendant's conviction. We reverse the imposition of consecutive sentences and order the Defendant's sentences to run concurrently.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part;**
**Reversed in Part**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Debbie Huskins, Assistant Public Defender, Johnson City, Tennessee and Steve McEwen, Mountain City, Tennessee, for the appellant, Kathryn White Byrd.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; Joe Crumley, District Attorney General; and Steve Finney, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The proof at trial established that Mr. Steve Grindstaff hired the Defendant to work for him in one of his hotels in 1996. The Defendant began her service as a desk clerk and was eventually promoted to general manager. As general manager, her duties included collecting the cash receipts for each day of business and depositing them in the hotel's bank account with First Tennessee Bank ("the Bank"). The Defendant also had access to the hotel's petit cash fund.

Vaughn Pearson was the comptroller for the hotel. His duties included reconciling the hotel's bank statements with the hotel's internally-generated computer records. In late August 2000, he noticed a discrepancy in the hotel's August bank statement. The hotel's internal records indicated cash receipts of $2,195.71 during the first several days of August. The bank statement did not reflect a deposit of this amount. Mr. Pearson called the Bank and spoke with Deborah Garland. Mr. Pearson testified that Ms. Garland told him that she could not find a deposit for that amount and would need to see a copy of the deposit slip. The matter was then turned over to Ronald Rayburn, the director of operations for the hotel.

Mr. Rayburn testified that the hotel's records included a handwritten receipt for a $2,195.71 deposit made on August 8, 2000. He further testified that, when he questioned the Defendant about this receipt, she explained that she had made the deposit late in the afternoon that day, that the computers had been down, and that a female teller had given her the handwritten receipt as a result. Mr. Rayburn presented the handwritten receipt to Preston Eldred of First Tennessee Bank, who agreed to research the matter. Mr. Rayburn testified that Mr. Eldred called him a few days later and stated that the Bank could not honor the alleged deposit because the Bank had not received that cash.

On the basis of this discrepancy, Mr. Rayburn researched more of the hotel's records. He discovered a deposit receipt for a deposit made in June that looked as though the bottom portion had been torn off along some perforations. When he placed the top edge of the handwritten receipt along the bottom edge of the June receipt, the two edges appeared to match. Mr. Rayburn testified, "when you kind of put them together then that was the whole receipt, you know, like somebody had torn the receipt and hand wrote the lower portion."

Deborah Garland with the First Tennessee Bank, commercial division, testified that she reviewed the handwritten receipt allegedly representing the August 8 deposit of $2,195.72. Upon reviewing the document, she searched the Bank's computer system but found no record of the deposit. Ms. Garland testified that she called the Defendant to gather some more information about the missing deposit. The Defendant told her that she had made the deposit at the branch located at "the Mall," that the teller had been a young white woman, that it was late in the day, and that the computers had been down. Ms. Garland testified that she had never seen a receipt written in that manner at First Tennessee Bank.

The contested receipt, which was introduced as an exhibit at the trial, is about two inches by three and one-quarter inches in size. The slip of paper has a portion of the name "First Tennessee" running along each short edge. Handwritten in black ink near the bottom appears "8/8/00 2195.71" followed by the handwritten and circled initials "LW." Across the bottom of the slip of paper is purple computer printing, stating "Account questions? Call 461-1237 for help." The face of the document contains no other information.

Ladonna White testified that she was employed as a teller by the Bank at the time in question. She stated that she occasionally worked at the Mall branch, but she did not remember ever seeing

the Defendant at her window. She reviewed the alleged receipt and testified that the handwriting was not hers. She further testified that she had never provided a customer with a receipt like the one proffered, even while the computers were down.

Karen Bowers also testified that she had been a teller for the Bank at the time in question. She explained that, when the computers were down, the procedure for providing a customer with a deposit receipt was to "hand write a receipt, but, you would stamp it with a bank stamp that has your teller number at the office and the date." She stated that she had not provided the receipt at issue and had never written one in that manner.

Preston Eldred, also employed by the Bank, testified that he knew the Defendant well enough to identify her on sight. He reviewed the video tapes recorded by the Bank's security system for the Mall branch on the afternoon of August 8, 2000. He testified that the Defendant did not appear on those tapes. She did, however, appear at the main office branch at about ten a.m. on that date. The Defendant was transacting some business with a teller, but Mr. Eldred could not discern the nature of the transaction from viewing the tapes. He also could not identify the teller with whom the Defendant was doing business.

Matt Sirois, employed by the Bank as regional bank operations manager, testified that he reviewed the contested receipt as well as the June receipt from which it may have been torn. Mr. Sirois testified that the computer printing at the bottom of receipts was a marketing statement that was generally changed on a monthly basis. He further testified that the June marketing statement for the Mall branch was "account questions call 461-1237 for help." The August marketing statement for the Mall branch was "bank online at www.FirstTennessee.com." Mr. Sirois also testified that he checked the Bank's records and found no record of the computers being down between the hours of 1:30 and 4:00 in the afternoon on August 8, 2000, at the Mall branch. Mr. Sirois further explained that, if a manual receipt had been necessary, it would have been validated by a teller stamp. He testified that he had never seen a First Tennessee Bank receipt given in the manner of the one at issue.

The State also introduced proof of several other discrepancies in the hotel's financial documents, including an alleged missing deposit for the cash receipts of June 1, 2000, in the amount of $340.52; another missing deposit for June 12, 2000, in the amount of $224.75; a missing September deposit in the amount of $697.48; an IOU signed by the Defendant indicating that she owed the petit cash fund $20; and an additional sum of $136.98 missing from the petit cash fund.

The Defendant testified in her defense. She adamantly denied having stolen any money from the hotel. She explained that the cash receipts from June 1 had been included with a deposit of cash receipts made on June 2. She could not fully explain the June 12 deposit discrepancy but testified that Mr. Rayburn's accounting for the vending machine cash that day might have caused the problem. She explained that the missing September deposit had not been made because the money had disappeared, either from being accidentally swept off her desk into the trash, or from another person taking it while it sat unattended on her desk. She acknowledged owing the petit cash fund

money, but explained that her actions in using money from that fund were within the standard practices of the hotel. The twenty dollars represented by the IOU she acknowledged having borrowed and owing; that is, she testified that she did not take that money with the intent to permanently deprive the owner of it. The other missing money from the fund she had used for hotel expenses, but acknowledged that she had not provided the hotel with receipts for those purchases.

With respect to the August 8, 2000, deposit, she explained that she had been in "a tremendous hurry" that day because she needed to pick her daughter up. She testified that she recognized Karen Bowers at trial as the teller who had accepted the deposit. Because she was in such a hurry, she testified, she "was probably a little rude to the teller." The Defendant stated that the teller tore off the original copy of the deposit slip and was attempting to stamp something on it, but the machine used for the stamping was not working. The Defendant stated that, while the teller was trying to stamp the receipt, she was pacing, frustrated, and "probably not the most polite person in the world." The Defendant testified that her behavior made the teller "flustered" and that the teller "finally said, let me just write you up a receipt." The Defendant stated that the teller stapled the receipt to the deposit book, and the Defendant glanced at it only long enough to verify the amount. The Defendant paid no further attention to the receipt until she was questioned about the deposit about a month later.

When initially questioned, the Defendant went back to the deposit book and retrieved the slip of paper she claimed to have been given by Ms. Bowers. She visited both the Mall branch and the Main branch, seeking the Bank's assistance in tracking the deposit down. Her efforts were unsuccessful, and she was fired a short time later.

The jury returned a verdict of guilt on one count of theft over $1,000 and assessed a fine in the amount of $2,195.71.

Initially, the Defendant contends that the evidence is not sufficient to support her conviction. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-

weigh or re-evaluate the evidence" in the record below.  <u>Evans</u>, 838 S.W.2d at 191; <u>see also</u> <u>Buggs</u>, 995 S.W.2d at 105.  Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment.  <u>See</u> <u>Tuggle</u>, 639 S.W.2d at 914.  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts.  <u>See</u> <u>State v. Morris</u>, 24 S.W.3d 788, 795 (Tenn. 2000); <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."  Tenn. Code Ann. § 39-14-103.  In this case, the State established that the hotel's cash receipts for August 2, 2000, through August 5, 2000, totaled $2,195.71.  The Defendant claimed, both as an employee and while testifying at trial, that she took these cash receipts and deposited them in the hotel's bank account on August 8, 2000.  In support of her claim, she proffered to her supervisor a document purporting to be a handwritten receipt from the Bank for the deposit. However, numerous Bank employees testified that the purported receipt did not meet the Bank's requirements for a manual receipt.  Karen Bowers, the teller whom the Defendant testified accepted the deposit, flatly denied having issued the purported receipt.  The Bank's employees testified that the Bank's records reflected no such deposit and that the Bank's surveillance tapes did not show the Defendant transacting any business at the time and place that she claimed to have made the deposit. This proof is sufficient to support a finding beyond a reasonable doubt that the Defendant took the $2,195.71 in hotel cash receipts, with the intent to deprive the owner of them and without the owner's effective consent.  Accordingly, the evidence is sufficient to support the jury's verdict and this issue is therefore without merit.[1]

The Defendant next contends that she is entitled to a new trial because the trial court did not require the State to elect a single instance of theft upon which to rely for conviction, and because the trial court did not provide the jury with an enhanced unanimity instruction requiring the jurors to be unanimous as to which instance(s) of theft it found her guilty.  The Defendant's argument is misplaced.

We acknowledge, of course, that "the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim."  <u>State v. Johnson</u>, 53 S.W.3d 628, 630 (Tenn. 2001).  Here, the Defendant was charged with only one count of theft; however, the State introduced evidence of nine specific instances of theft.  Nevertheless, the State was not required to elect from among these nine instances under the circumstances of this case.  Where an accused is alleged to have stolen property in separate acts but from the same owner, from the same location, and pursuant to a continuing criminal impulse or a single sustained larcenous scheme, the State is permitted to aggregate the value of the stolen property and prosecute the thefts as a single offense.  <u>See</u> <u>State v.</u>

---

[1] Because the proof of this single theft is sufficient to support the conviction, we deem it unnecessary to review the remaining evidence of the other alleged thefts.

Cattone, 968 S.W.2d 277, 279 (Tenn. 1998). Accordingly, the trial court did not err in not requiring the State to elect among the nine thefts. Furthermore, the trial court did not err in not issuing an enhanced unanimity instruction. See State v. Black, 75 S.W.3d 422, 425-26 (Tenn. Crim. App. 2001) (no enhanced unanimity instruction required where State aggregated over 150 separate acts of embezzlement into a single theft offense). This issue is without merit.

Finally, the Defendant contends that the trial court erred in ordering the Defendant's sentence in this case to run consecutively to her sentence for a prior conviction. The State concedes that the trial court erred in this regard.

In March 1997, the Defendant pled guilty to one count of theft over $60,000. The trial court sentenced the Defendant to eight years, to be served by six months in jail and fifteen years in community corrections. On June 26, 1998, the Defendant's supervision was ordered "transferred from the Alternative Community Corrections Program to be placed under the supervision of the State of Tennessee Department of Correction probation division." The order transferring the Defendant's supervision also provides that the Defendant remained bound by her community corrections agreements, "to include sentence increase, as outlined in TCA 40-3[6]-106[e](4)." This order was apparently entered in response to the recommendation of the Alternative Community Corrections Program following the Defendant's successful completion of the Moral Recognition Therapy program and her satisfaction of other sentencing requirements.

Upon the Defendant's conviction of the instant offense, the trial court revoked the Defendant's alternative sentence and increased her original eight-year sentence to twelve years in the Department of Correction. The trial court sentenced the Defendant on the instant offense to four years in the Department of Correction. The Defendant's four-year sentence in the instant case was ordered to be served consecutively to the prior sentence on the basis that the Defendant was being sentenced "for an offense committed while on probation." Tenn. Code Ann. § 40-35-115(b)(6). The Defendant points out, and the State concedes, that the Defendant was serving her prior sentence on community corrections, not on probation. Thus, the Defendant contends and the State concedes, the trial court erred in relying upon factor (b)(6) for the imposition of consecutive sentences.

Apparently, the trial court considered the Defendant to be "on probation" because she was being supervised by the Department of Correction probation division.[2] However, the Defendant's community corrections sentence was not revoked in conjunction with the transfer; rather, it remained intact. Thus, the Defendant was not "on probation" when she committed the instant offense.

Community corrections and probation are not fungible methods of serving an alternative sentence. See State v. Pettus, 986 S.W.2d 540, 544 (Tenn. 1999) ("A review of the language of the relevant statutes reveals a clear distinction between community corrections and probation.")

---

[2]Immediately prior to imposing sentence for the instant crime, however, the trial court increased the Defendant's prior sentence, which is permissible upon the revocation of a community corrections sentence but not upon the revocation of probation. See Tenn. Code Ann. §§ 40-36-106(e)(4), 40-35-311(d).

Moreover, our supreme court has specifically found that "the legislature did not intend a community corrections sentence and a probation sentence to be equivalents for purposes of consecutive sentencing under [factor (b)(6)]." Id. Thus, the trial court in this case erred in ordering the Defendant's sentences to be served consecutively on the basis that she was "on probation" at the time she committed the instant offense. Accordingly, we reverse that portion of the trial court's judgment ordering the Defendant's sentences to be served consecutively.

In its brief, the State "requests that this case be remanded to allow it to put on proof of other facts which would support the imposition of consecutive sentences." The State cites no authority for this requested second bite at the apple, and this issue is therefore waived. See Tenn. Ct. Crim. App. R. 10(b). The State was given ample opportunity to present any proof relevant to the trial court's sentencing decision at the Defendant's sentencing hearing. Furthermore, the trial court considered five other possible grounds for imposition of consecutive sentences and rejected them.[3] The State is not entitled to a second hearing.

We reverse that portion of the trial court's judgment which imposes consecutive sentences. The Defendant's sentences are ordered to be served concurrently and we remand this matter for a corresponding modification of the judgment. In all other respects we affirm the judgment of the trial court.

_____
DAVID H. WELLES, JUDGE

---

[3] There is an additional factor set forth in the relevant statute which the trial court did not mention, but it applies only to sentences for criminal contempt. See Tenn. Code Ann. § 40-35-115(b)(7).